**P. W. HUSSERL, INC., Paul W. Husserl and Solomon Motove, doing business as Paul W. Husserl, Louis Smiles, Roy Smiles and Blanch Smiles, doing business as Smiles Stores, on behalf of themselves and all others similarly situated, Plaintiffs,**

v.

**SIMPLICITY PATTERN CO., Inc., Defendant.**

United States District Court
S. D. New York.

Feb. 7, 1961.

**56**

Fischer & Shilkoff, Roosevelt, N. Y., for plaintiffs; Peaslee, Brigham, Albrecht & McMahon, New York City, of counsel.

House, Grossman, Vorhaus & Hemley, New York City, for defendant; Sidney Greeman, Ira J. Goldstein, New York City, of counsel.

FREDERICK van PELT BRYAN, District Judge.

This is a private action brought pursuant to 15 U.S.C.A. § 15, in which plaintiffs, suing on behalf of themselves and all others similarly situated, seek to recover treble damages from defendant Simplicity Pattern Co., Inc., for alleged violation of Section 2(e) of the Clayton Act as amended by the Robinson-Patman Act (15 U.S.C.A. § 13(e)).

The suit stems from Federal Trade Commission v. Simplicity Pattern Co., 360 U.S. 55, 79 S.Ct. 1005, 3 L.Ed.2d 1079, in which the Supreme Court affirmed a cease and desist order of the Federal Trade Commission based upon findings that Simplicity, in violation of Section 2(e) as amended, had discriminated in favor of its larger customers by furnishing to them services and facilities not accorded to competing smaller customers on proportionately equal terms.

Plaintiffs, P. W. Husserl, Inc., Paul W. Husserl and Smiles Stores, commenced this action against Simplicity within a month after that case was decided. These plaintiffs are retail stores engaged primarily in the sale of yardgood fabrics and notions who purchase dress patterns from Simplicity for sale in their stores. They claim that they were damaged by the practices of Simplicity found to be discriminatory by the Commission, and that they fall within the category of customers against whom Simplicity was found to have discriminated. Plaintiffs rely on the Supreme Court decision as prima facie evidence of violations of the anti-trust laws by the defendant. 15 U. S.C.A. § 16.

Since the action was commenced numerous other plaintiffs claiming to be in the same category have been permitted to intervene and there are now some 43 plaintiffs in the action. Each seeks judgment for money damages in a stated sum alleged to have been suffered by reason of Simplicity's discriminatory practices, and reasonable attorneys' fees and costs.

Six of these plaintiffs claim that solely because they are plaintiffs in this suit to enforce their rights under the anti-trust laws against Simplicity, Simplicity unlawfully cancelled its contracts with them for the sale of dress patterns and refuses to deal with them. Plaintiffs P. W. Husserl, Inc., Paul Husserl, House of Materials, Inc. and Smiles Stores moved

before me for a preliminary injunction restraining Simplicity from refusing to deal with them. Thereafter two other plaintiffs, C. & R. Grand Stores and D. W. Newfield Company, moved before me for the same relief. All six plaintiffs claim that defendant's refusal to deal with them results in immediate danger of irreparable loss or damage.

Neither on the argument nor subsequently have any of the parties suggested that testimony should be taken on the motions. Both motions are before me for decision on the extensive affidavits submitted.

Simplicity is the nation's largest manufacturer of tissue patterns used in the home for making women's and children's wearing apparel. Its volume of sales in terms of units is greater than that of all other major producers combined.

All of the plaintiffs are small retail stores whose primary business is the sale of yardgood fabrics and notions. Stores in this general category comprise 82% of Simplicity's customers and account for some 30% of Simplicity's total sales volume. These stores are primarily interested in selling yardgoods and notions. They handle patterns largely as an accommodation to their fabric customers and for the purpose of stimulating their sales of fabrics and notions.

For some time each of the moving plaintiffs has purchased patterns from Simplicity for resale in their stores under substantially identical contracts which appear to be in the form generally in use by Simplicity for its small store customers. These contracts differ in substantial respects from the arrangements previously made with Simplicity's larger customers who are mostly department and variety stores handling a multitude of relatively low-priced articles.

Under each of the plaintiffs' contracts Simplicity shipped a complete line of patterns to the retail merchant who paid cash for the patterns so shipped in the regular course. New patterns were shipped each month and three times a year Simplicity would buy back from the retailer patterns which were outmoded. The retailer was obligated to keep a complete inventory. Simplicity furnished catalogues and promotional material to the retailer for which the retailer was required to pay in regular course at stated prices.[1]

The agreements were "to remain in force for the term of five years from date of acceptance at New York and from term to term thereafter, unless terminated by either party by written notice served sixty days prior to the expiration of the initial or any succeeding term."

This action was filed on July 8, 1959. On December 10, 1959 Paul Husserl, P. W. Husserl, Inc. and Smiles Stores, who were then the only plaintiffs in the action, received written notice from Simplicity of the termination of their contracts. The P. W. Husserl, Inc. and Paul W. Husserl contracts were close to the end of the five year term from the date of acceptance. They were terminated effective at the end of the existing term without explanation. The Smiles Stores contract ran by its terms from May 14, 1957 to May 14, 1962. Smiles Stores received the following letter of termination:

"We refer you to our agreement dated May 14, 1957.

"You have instituted an action in the United States District Court for the Southern District of New York against Simplicity Pattern Co. Inc. alleging that the terms and conditions of said contract are in violation of Section 13(e) of Title 15 of the United States Code and you contend that the continuing performance of the terms of that agreement by Simplicity Pattern Co. Inc. entitles you to continuing treble dam-

---

1. A fuller description of the way in which Simplicity's business was conducted and the differences between its method of dealing with its larger customers and with small stores is found in Federal Trade Commission v. Simplicity Pattern Co., supra, 360 U.S. at pages 59–62, 79 S.Ct. at pages 1008–1010.

ages. Such allegations have been and are denied by Simplicity Pattern Co. Inc.

"In order to obviate any further issue with respect thereto, we hereby agree that we will repurchase from you your presently existing stock of Simplicity patterns at the cost thereof to you and that we will repurchase from you the pattern cabinet heretofore sold to you at the amount heretofore paid by you to us therefor. Such payment will be made on condition that your pattern stock and pattern cabinet is received at our place of business in Niles, Michigan not later than January 11, 1960 and on further condition that thereupon our contract dated May 14, 1957 shall thereby be terminated.

"In the event that Simplicity Pattern Co. Inc. shall not have received your pattern stock and pattern cabinet upon the conditions aforesaid on or before January 11, 1960, we hereby give you notice that in order to prevent the possible further accrual of damages we now terminate our contract with you effective as of March 10, 1960. We give you such extended notice of proposed termination of the contract so that you may in the interim time arrange for such other pattern service as you may wish."

It may be noted that in the case of the Smiles Stores contract the cancellation was made in the midst of the original five-year term from the date of acceptance and was not a cancellation on notice at the termination of the initial term.

These three plaintiffs moved to enjoin the cancellation of their contracts upon the theory that cancellation was actuated solely as a punitive measure against them for pursuing their legal rights under the Robinson-Patman Act and as a part of a concerted plan to deter other small stores in similar position from taking such action. After argument, Judge Dimock denied this motion, without opinion, on March 29, 1960.

The additional plaintiffs who were permitted to intervene thereafter included the moving plaintiffs, House of Materials, Inc., D. W. Newfield Company and C. & R. Grand Stores, Inc. After such intervention the contracts of House of Materials, Inc. and Newfield Company were cancelled by Simplicity by written notice given sixty days before the end of the current five-year term. C. & R. Grand Stores had five contracts with the defendant covering different stores. The contract covering the Hewlett Store, which was the only contract approaching the end of the term, was likewise cancelled by written notice as of the end of the term. No explanation was given for these cancellations.

All of the moving plaintiffs except Smiles Stores have carried Simplicity patterns for five years or more. C. & R. Grand Stores has carried them for thirteen years. D. W. Newfield Company has carried them for twenty-five years.

It appears that no contract of any plaintiff which has approached the end of the initial term has not been cancelled. There is no indication that any contracts have been cancelled except those of plaintiffs in the action.

Two of the plaintiffs, House of Materials, Inc. and C. & R. Grand Stores, state in affidavits that when they telephoned the defendant after receiving the notices of cancellation they were informed in substance that the defendant would refuse to renew their contracts as long as they were parties to this action, but that the contracts would be renewed if they withdrew. This is not denied by the defendant.

Simplicity cannot seriously question that these cancellations were made because the plaintiffs were parties to this action against it. Indeed, it takes the position that its counsel has advised it that it may refuse to deal with anyone it chooses and implies that there are no limitations on its right to do so.

Its letter to Smiles Stores which cancelled that contract in the midst of the initial term makes it plain that the rea-

son for cancellation was that Smiles was a plaintiff in this suit. The letter also suggests that if Simplicity continued to perform its agreement Smiles would claim continuing treble damages and that one of the reasons for cancellation was to avoid the possibility of the further accrual of such damages. However, the complaint in this action does not seek continuing damages but asks for money damages in a stated sum. Simplicity cannot expect the court to assume that it has failed to obey the cease and desist order of the Federal Trade Commission affirmed by the Supreme Court and still persists in the discriminatory practices which were condemned by the Supreme Court and on which the present action is based. Unless such an assumption was made there would be no basis for a claim of continuing damages. The theory of cancellation to avoid accrual of additional damages appears spurious.

Attempts by Simplicity to show that there were motives for cancellation other than participation in this suit are far from convincing. For example, it refers to the fact that Paul W. Husserl indicated a desire to cancel its contract in 1959 because its sales of Simplicity patterns were small. However, it appears that Simplicity rejected that suggestion and succeeded in persuading Husserl that its pattern sales would markedly increase, which they did.

Defendant implies that an additional motive for cancelling the C. & R. Grand Stores contract was because Grand Stores were slow payers. But Simplicity had been dealing with Grand for thirteen years and had made no attempt to cancel any of the Grand contracts on this account. The Grand contract was cancelled only after Grand had become a party plaintiff.

Defendant is no more successful in implying that the contracts of some of the plaintiffs were cancelled because they were unprofitable. Defendant does not show that the volume of sales of any of the plaintiffs' stores was substantially different from the volume of many other stores of a similar character with whom

it continues to maintain contracts. Nor is there anything to show that these contracts are any less desirable than other contracts which defendant has with retail merchants in a similar position.

The pattern of Simplicity's conduct with respect to these contracts, as distinguished from the numerous contracts which it maintains, negatives any other motive for cancellations than the exertion of economic pressure to deter plaintiffs from pursuing their legal rights and remedies. The defendant's course of conduct leads to the inescapable conclusion that the cancellations are part of a deliberate plan to cancel contracts of all those who elect to assert their rights against it under the anti-trust laws for the purpose of deterring suit through the exercise of economic coercion.

Thus I find that the plaintiffs have shown prima facie that the sole reason for cancellation of their contracts and the refusal to deal with them was that they had brought this suit against the defendant and that the defendant's purpose in so doing was to deter them by economic coercion from pursuing their legal remedies under the anti-trust laws.

The moving plaintiffs urge that in view of "the public interest in vigilant enforcement of the antitrust laws through the instrumentality of the private treble-damage action" (Lawlor v. National Screen Service, 349 U.S. 322, 329, 75 S.Ct. 865, 869, 99 L.Ed. 1122) the defendant should not be permitted to pursue a policy of refusing to deal with them as a weapon of economic coercion to deter them from pursuing the private remedies afforded to them by the anti-trust acts. Such a course of conduct is, they say, directly contrary to the public policy enunciated by Congress that private anti-trust remedies are an essential part of the statutory scheme for the enforcement of the laws against monopoly, restraint of trade and unfair competition.

Defendant, on the other hand, relies on "the long recognized right of trader or manufacturer engaged in an entirely

private business, freely to exercise his own independent discretion as to parties with whom he will deal". United States v. Colgate & Co., 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992. It says that it cannot be compelled to deal with the plaintiffs in the absence of any purpose to create or maintain a monopoly or to engage in contracts and combinations which are violative of the anti-trust laws.

Determination of the issue drawn here requires the weighing and evaluation of the considerations which affect the important public policy on which the plaintiffs rely as against the right to choose its customers upon which the defendant relies. No direct authority on this question has been called to my attention and I know of none.

The Clayton Act strongly evidences the intent of Congress to encourage private suits for violation of the anti-trust laws. Under Section 4 (15 U.S.C.A. § 15) a successful plaintiff is entitled to "threefold the damages by him sustained". He may also recover the "cost of suit, including a reasonable attorney's fee". Venue provisions are liberal and suit may be brought "without respect to the amount in controversy".

Section 5 (15 U.S.C.A. § 16) provides that a final judgment against a defendant in proceedings by the Government for violation of the anti-trust laws may be introduced by a private litigant in a subsequent treble damage action under such laws to establish a prima facie violation. The statute of limitations against private anti-trust rights of action is tolled during the pendency of any proceedings brought by the Government so that private suitors under the anti-trust laws may have the benefit of any judgment which the Government, with its superior resources, may obtain. Thus the private anti-trust litigant was deliberately given special treatment to encourage him to pursue the remedies granted.

█ Congress was not content to rely on Government agencies for the effective enforcement of the anti-trust laws. The private anti-trust suit is part and parcel of the enforcement machinery. It is designed as an instrument not only for the redress of private wrongs but for the imposition of punitive sanctions through the recovery of treble damages "to act as a deterrent against a repetition of the offense and to serve as a warning to potential violators". United States v. Standard Ultramarine and Color Co., D. C.S.D.N.Y., 137 F.Supp. 167, 171. This is for the purpose of promoting increased and more effective anti-trust law enforcement. Radovich v. National Football League, 352 U.S. 445, 454, 77 S.Ct. 390, 1 L.Ed.2d 456; Lawlor v. National Screen Service, 349 U.S. 322, 75 S.Ct. 865, 99 L.Ed. 1122; Karseal Corp. v. Richfield Oil Corp., 9 Cir., 221 F.2d 358, 365; Maltz v. Sax, 7 Cir., 134 F.2d 2, 4, certiorari denied 319 U.S. 772, 63 S.Ct. 1437, 87 L.Ed. 1720; United States v. Standard Ultramarine and Color Co., supra; Weinberg v. Sinclair Refining Co., D.C.E.D.N.Y., 48 F.Supp. 203, 205; Quemos Theatre Co., Inc. v. Warner Bros., D.C.N.J., 35 F.Supp. 949, 950. See, also, Loevinger, "Private Action— The Strongest Pillar of Anti-trust", 3 Antitrust Bull. 167 (1958); Bicks, "The Department of Justice and Private Treble Damage Action", 4 Antitrust Bull. 5 (1959).

On the other hand, the right of an individual trader to determine in his own discretion with whom he may or may not deal under the doctrine of United States v. Colgate & Co., supra, and Frey & Son, Inc. v. Cudahy Packing Co., 256 U.S. 208, 41 S.Ct. 451, 65 L.Ed. 892, is by no means untrammeled. Such cases as Eastman Kodak Co. of New York v. Southern Photo Materials Co., 273 U.S. 359, 47 S. Ct. 400, 71 L.Ed. 684; Federal Trade Commission v. Beech-Nut Packing Co., 257 U.S. 441, 42 S.Ct. 150, 66 L.Ed. 307; United States v. Bausch & Lomb Optical Co., 321 U.S. 707, 64 S.Ct. 805, 88 L.Ed. 1024; Lorain Journal Co. v. United States, 342 U.S. 143, 72 S.Ct. 181, 96 L. Ed. 162, and finally, United States v. Parke, Davis & Co., 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505, illustrate that the

Colgate doctrine is at best a "limited dispensation". Times-Picayune Publishing Co. v. United States, 345 U.S. 594, 626, 73 S.Ct. 872, 97 L.Ed. 1277. The result reached in Colgate is "tolerated but only when it is the consequence of a mere refusal to sell in the exercise of the manufacturer's right 'freely to exercise his own independent discretion as to parties with whom he will deal.' * * * When the manufacturer's actions, as here, go beyond mere announcement of his policy and the simple refusal to deal, and he employs other means which effect adherence to his resale prices, this countervailing consideration is not present and therefore he has put together a combination in violation of the Sherman Act [15 U. S.C.A. §§ 1–7, 15 note]. United States v. Parke, Davis & Co., supra, 362 U.S. at page 44, 80 S.Ct. at page 512.

Thus the circumstances under which the trader is free to refuse to deal have been increasingly circumscribed. Indeed, Mr. Justice Harlan in his dissent in the Parke, Davis case went so far as to say that "The court has done no less than send to its demise the Colgate doctrine" (supra, 362 U.S. at page 49, 80 S.Ct. at page 514) and that this result was reached "upon the Court's notion of 'countervailing' social policies" (supra, 362 U.S. at page 57, 80 S.Ct. at page 518) militating against the right of the individual trader freely to choose his customers.

More recently in George W. Warner & Co. v. Black & Decker Mfg. Co., 2 Cir., 277 F.2d 787, Judge Moore, writing for a unanimous court, had occasion to discuss the limitations and qualifications placed upon the Colgate doctrine by the later cases. In reversing dismissal of a Sherman Act complaint based on refusal to deal in support of a retail price maintenance program, he concluded that the Colgate doctrine was still valid only when the facts surrounding the refusal to deal were "of such Doric simplicity as to be somewhat rare in this day of complex business enterprise". Supra, at page 790.

Whether or not the Supreme Court has departed as far from the Colgate case as Mr. Justice Harlan indicated in his Parke, Davis dissent, there is little doubt by now that the right to choose one's customers and to refuse to deal is not unlimited and must under appropriate circumstances give way to considerations of public policy which require its reasonable restriction in the public interest.

The right to refuse to deal cannot be viewed as an abstract concept. A refusal to deal takes color from its surroundings and from the circumstances in which it is attempted to be exercised. Where the purpose is unlawful there is no absolute right to refuse to deal in the untrammeled discretion of the trader.

In the case at bar the refusal to deal is a bold attempt on the part of defendant Simplicity to deter litigants by economic coercion from pursuing the lawful remedies granted them by Congress under the anti-trust laws. Congress envisaged such private suitors as "allies of the government in enforcing the anti-trust laws". 51 Cong.Rec. 16319 (1914). To permit private suitors in that position to be coerced from pursuing the remedies which Congress gave them would frustrate the public policy which motivated Congress to grant such remedies. It would permit violators of great economic strength to rest secure from remedial and punitive action by private litigants through the exercise of their economic power. Such a result cannot be tolerated by the courts if the policies enunciated by Congress are to be carried out.

In Ring v. Spina, 2 Cir., 148 F.2d 647, 160 A.L.R. 371, certiorari denied 335 U. S. 813, 69 S.Ct. 30, 93 L.Ed. 368, plaintiff, a theatrical producer, sued for treble damages alleging that a basic agreement of defendant The Dramatists' Guild of the Authors' League of America, Inc., an association said to include most of the playwrights of the country, was in violation of the Sherman Act. Plaintiff himself had signed the agreement as had the defendants. He applied to the District

Court for an interlocutory injunction restraining defendants pending trial from proceeding with arbitration under the basic agreement, and from interfering with plaintiff's production. The District Court denied the application on the ground, among others, that relief should not be granted because plaintiff, by signing the basic agreement, was himself participating in the alleged illegal combination and the parties were therefore in pari delicto. The Court of Appeals reversed, holding that a prima facie showing had been made that the agreement was in violation of the Sherman Act and that plaintiff was not barred from relief because he was in pari delicto. It found that the plaintiff had been compelled to sign the agreement through economic coercion exercised by the defendants and that under such circumstances the doctrine of pari delicto could not be invoked against him. The court indicated strongly that victims of restraint of trade should be protected by the courts against restriction or denial of their anti-trust remedies, saying (at page 653):

" * * * But here even without a showing of economic coercion as the final step in forcing him to sign the Basic Agreement, plaintiff is precisely the type of individual whom the Sherman Act seeks to protect from combinations fashioned by others and offered to such individual as the only feasible method by which he may do business. Considerations of public policy demand court intervention in behalf of such a person, even if technically he could be considered in pari delicto. Indeed, this is a general principle applicable beyond the anti-trust field. Thomas v. City of Richmond, 79 U.S. 349, 12 Wall. 349, 20 L.Ed. 453; City of Parkersburg v. Brown, 106 U.S. 487, 503, 1 S.Ct. 442, 27 L.Ed. 238; Logan County Nat. Bank v. Townsend, 139 U.S. 67, 11 S.Ct. 496, 35 L.Ed. 107; In re Builders' Finance Ass'n, D.C.S.D.Cal., 26 F.2d 123. Any other conclusion would mean that for many, perhaps most, victims of restraint of trade, private remedies under the Sherman Act would be illusory, if not quite non-existent."

In the case at bar considerations of public policy also demand intervention by the court to protect those who, claiming to be victims of restraint of trade, have brought action to enforce their rights. Such right as the defendant may have to refuse to deal with whom it chooses in its own untrammeled discretion must give way to the overriding considerations of the strong public policy in favor of permitting private suitors to maintain actions for violation of the anti-trust laws both in their own and in the public interest.

The proviso in 15 U.S.C.A. § 13 (a) that nothing therein contained "shall prevent persons engaged in selling goods, wares, or merchandise in commerce from selecting their own customers in bona fide transactions and not in restraint of trade" is not a franchise to defendant to pursue its planned program of refusal to deal with these plaintiffs. From all that has been said it is quite clear that defendant's actions in this direction are not "bona fide transactions" within the meaning of Section 13(a) since they are contrary to the public policies enunciated by Congress in the Anti-Trust Laws. This proviso does not bar the courts from intervening to protect private suittors against such conduct as defendant has engaged in in this case.

Nor do the cases on which the defendant relies such as Great Atlantic & Pacific Tea Co. v. Cream of Wheat, 2 Cir., 227 F. 46; Naifeh v. Ronson Art Metal Works, 10 Cir., 218 F.2d 202; Nelson Radio & Supply Co., Inc. v. Motorola, Inc., 5 Cir., 200 F.2d 911, certiorari denied 345 U.S. 925, 73 S.Ct. 783, 97 L. Ed. 1356; and Chicago Seating Co. v. S. Karpen & Bros., 7 Cir., 177 F.2d 863, impinge on the conclusion which has been reached here. These cases, all decided before the Parke, Davis case, concern merely a simple refusal to deal with a customer by an individual seller. None

of them hold that there is a right to refuse to deal with customers in pursuance of a plan to punish them for, or deter them from, pursuing the private remedies granted them by the anti-trust laws. In none of them was the refusal to deal in pursuance of an objective inimical to the purposes and policies of the anti-trust laws as it is in this case. Moreover, in none of these cases did the defendant occupy as dominant a position in the market as does this defendant.

I conclude that the court may intervene to protect these plaintiffs against the defendant's planned program of economic coercion for the purpose of deterring them from pursuing this suit and may restrain defendant from continuing to refuse to deal with plaintiffs in pursuance of such an objective under the circumstances shown here.

Defendant also contends that the decision of Judge Dimock denying the prior motion of plaintiffs Husserl, Inc., Paul W. Husserl and Smiles Stores for similar preliminary injunctive relief without opinion following argument is binding and requires the denial of the present motions. At that time these three were the only plaintiffs in the action and only their contracts had been cancelled. Judge Dimock gave no reasons for his decision. But he may well have found that there was not sufficient reason to conclude that defendant was pursuing a concerted plan of refusing to deal with persons who brought suit against him under the Robinson-Patman Act for the purpose of deterring such persons from suing and punishing them for so doing.

Since that time, however, defendant has continued to follow its policy of cancellation and it has not allowed a single contract with a plaintiff which was nearing the end of its initial term to continue under the automatic renewal clause. This pattern of conduct now makes it plain that defendant is engaged in a deliberate program of refusing to deal with all who joined this lawsuit as plaintiffs as a means of coercing them from pursuing their lawful remedies. In view of these later developments Judge Dimock's denial of the prior motion is not binding. Securities and Exchange Commission v. Graye, D.C.S.D.N.Y., 156 F. Supp. 544.

Defendant urges that interlocutory relief should be denied the moving plaintiffs because they have not shown an immediate danger of irreparable damage if such relief is not granted. In my view, however, plaintiffs have shown "that the danger of irreparable loss or damage is immediate" sufficiently to support the issuance of an interlocutory injunction under 15 U.S.C.A. § 26.

Plaintiffs' stores have carried Simplicity patterns for some years. Over this period their customers have grown to expect and demand Simplicity patterns. As is the rule in most of the country, more than half of the patterns sold in these stores prior to cancellation were Simplicity patterns. Because of widespread promotion, good salesmanship, and perhaps special qualities of the product, other competing patterns are not adequate substitutes. Simplicity patterns can only be obtained from the defendant.

The plaintiff stores depend heavily on their sale of Simplicity patterns to spark the sale of fabrics. Although the patterns sell for only between 25¢ and 75¢ apiece, each sale of a pattern is likely to, and frequently does, result in a sale of several dollars worth of material. The moving plaintiffs variously estimate that between 5% and 25% of their sales of fabrics and notions, which constitute their principal business, are the results of sales of Simplicity patterns.

Plaintiffs' losses as a result of defendant's refusal to deal with them are not confined to the profits from the sale of patterns which are relatively small. The loss of sales of fabrics and notions involves a substantial proportion of their total business. Moreover, the failure of customers to find the Simplicity patterns which they want is likely to mean that such customers go elsewhere and it may result in losing them permanently.

There is plainly a substantial loss of good will involved which is difficult, if not impossible, to establish and which may never be adequately recompensed by such damages as can be proven. The competitive disadvantage under which plaintiffs are placed is severe.

Moreover, it does not appear that defendant will suffer any appreciable loss or damage if it continues to deal with the plaintiffs under the terms and conditions which prevailed before cancellation. Thus, when the respective burdens on the parties are balanced, the balance is strongly in favor of plaintiffs. See Ohio Oil Co. v. Conway, 279 U.S. 813, 49 S.Ct. 256, 73 L.Ed. 972; Chicago, B. & Q. R. Co. v. Chicago, Great Western R. Co., 8 Cir., 190 F.2d 361. As I have pointed out, defendant has not effectively demonstrated that the agreements with these plaintiffs are unprofitable. Nor has it shown any potential loss which might arise if its dealings with the plaintiffs on this basis should continue. The dealings have been carried on satisfactorily in most cases for a number of years. There has been no significant change in the course of them or in the relationship between the parties other than that brought about by the plaintiffs' election to participate in the present suit. The injunction which the moving plaintiffs seek merely envisages a continuation of a normal commercial relationship which has persisted for some considerable time.

Furthermore, the rights asserted by the moving plaintiffs to pursue their anti-trust remedies without being subject to the punitive measures adopted by the defendant must be balanced against the right to refuse to deal asserted by the defendant. Since the right which the defendant asserts is, under the circumstances presented here, contrary to public policy, the court should be inclined to grant relief in furtherance of the public interest. Perry v. Perry, 88 U.S.App.D.C. 337, 190 F.2d 601; Doeskin Products v. United Paper Co., 7 Cir., 195 F.2d 356.

There are good reasons here why the court in the exercise of its discretion should preserve the status quo between the parties which existed at the time when the plaintiffs first participated in this action.

There remains the question of the relief to be granted. Pending the final hearing and determination of the action the defendant will be enjoined from refusing to deal with the moving plaintiffs or to sell such plaintiffs its products and will be directed to continue to deal with the moving plaintiffs upon the same terms and conditions as provided by the contracts which it has cancelled. However, the order to be entered shall also provide that such injunctive relief is granted only upon the condition that the moving plaintiffs shall not assert any claims for damages in this action or otherwise by reason of defendant having continued to deal with them under the terms and conditions of the agreements which defendant cancelled, during the period while such order is in effect. This provision is to insure full protection of the defendant in view of its claim, unwarranted though it appears to be, that it cancelled its contracts with the moving plaintiffs in order to prevent the accrual of further claims by plaintiffs for damages arising under such agreements.

It will be necessary at the trial of the action for the issues relevant to the refusal to deal to be tried. The defendant will then have an opportunity to establish whether it has any legitimate business reason, apart from the bringing of this suit, for its refusal to deal with the moving plaintiffs. That is a matter for the trial court which then may fashion an appropriate decree in the light of the facts and circumstances which are then developed.

However, the present complaint does not pose such an issue. The moving plaintiffs will therefore be directed, pursuant to Rule 15(a), F.R.Civ.P., 28 U. S.C.A., to serve an amended complaint tendering such issue within fifteen days from the date of the order to be entered upon this decision.

Each of the moving plaintiffs will be required to give security in the sum of

$2,000 for the payment of such costs and damages as may be incurred or suffered in the event that defendant is found to have been unlawfully enjoined pursuant to Rule 65(c), F.R.C.P. This amount is fixed in the light of the relatively insubstantial yearly dollar volume of pattern sales to the various moving plaintiffs.

The foregoing opinion constitutes my findings of fact and conclusions of law pursuant to Rule 52(a), F.R.C.P.

Settle order which conforms with Rule 65(d), F.R.C.P., on notice.